**INTERNATIONAL OUTSOURCING SERVICES, LLC, Plaintiff,**

v.

**The UNITED STATES, Defendant,**

**NCH Marketing Services, Defendant–Intervenor.**

No. 05–768C.

United States Court of Federal Claims.

Filed Under Seal Oct. 25, 2005.

Reissued Nov. 29, 2005[1].

---

1. An unredacted version of this opinion was issued under seal on October 25, 2005. The opinion issued today incorporates the parties' jointly proposed redactions and corrects some minor typographical errors. This redacted material is represented by brackets [].

Richard Lee Moorhouse, Greenberg Traurig, LLP, McLean, VA, for plaintiff.

David Charles Hoffman, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General Peter D. Keisler, for defendant.

Richard Paul Rector, Piper Rudnick Gray Cary U.S. LLP, Washington, D.C., for defendant-intervenor.

## OPINION

ALLEGRA, Judge.

In this post-award bid protest action, the plaintiff, International Outsourcing Services LLP ("IOS"), was declared ineligible for the award of a contract by the Defense Commissary Agency (DeCA) essentially because it failed fully to respond to repeated requests for pricing information. The contract instead was awarded to the defendant-intervenor herein, NCH Marketing Services (NCH). On the parties' cross-motions for judgment on the administrative record, this court finds that the United States, acting through DeCA, was well within its rights in eliminating plaintiff from the competitive range based upon the latter's failure to put the agency in the position to evaluate its proposal properly.

## I. FACTS

On April 23, 2004, DeCA issued Solicitation No. HDEC08–04–R–0019 (the Solicitation) to secure coupon processing and redemption services in relation to its worldwide commissary facilities. The Solicitation called for the award of a fixed-price contract for a one-year base period, with four one-year options. It initially estimated that 200 million coupons would be processed annually, with the contractor to be paid a fixed fee for every thousand coupons processed. Additionally, the contractor would receive "reimbursements for payments received from manufacturers for postage and special shipping and handling fees invoiced by the contractor."

Under the terms of the Solicitation, proposals were to be evaluated "[u]sing a tradeoff process," with the award to be made to "the responsible offeror whose offer conforming to the solicitation will be the most advantageous and provide the best value to the Government" under the evaluation factors included in the Solicitation. The Solicitation noted that "[t]he process permits tradeoffs among cost or price and non-cost factors and allows the Government to accept other than the lowest priced proposal or other than the highest technically rated offeror." Proposal were to be evaluated based on two basic factors: (i) performance capability, including subfactors of technical capability (operations and quality control), personnel (staffing and qualifications), and past performance (similarity of experience, timeliness of performance, and business relations); and (ii) price. The performance capability factor was to be approximately equal in importance to the price factor. In a segment entitled "Price and Price Realism," the Solicitation mandated that—

> [p]roposals will be evaluated to determine whether offered prices are realistic in relation to the work to be performed; reflect a clear understanding of the requirements, and are consistent with other portions of the offeror's proposal. The PRICE factor will not be scored. Price will be evaluated by adding the total price of all line items, base year plus four one year options.

The phrase "price realism" was not further defined in the Solicitation.

DeCA received two proposals in response to the Solicitation—one from IOS and the other from the incumbent contractor, NCH. IOS offered a processing fee of [ ] per thousand coupons in the base year, with [ ] per thousand for the first option year, and [ ] per

thousand for the second, third, and fourth option years. By comparison, NCH offered a price of [ ] per thousand coupons during the base year, which increased to [ ] per thousand coupons by the final option year.

On July 14, 2005, the DeCA contracting officer responded to IOS' proposal in a letter. She advised IOS that "discussions, clarifications, and/or corrections [were] required," as its proposal did "not demonstrate that [it] had a clear understanding of the requirements." By way of explanation, the letter stated:

> Based on historical data, your proposal price seems extremely low and therefore, reasonableness of your price could not be determined. Prices are evaluated to determine whether they are realistic in relation to the work to be performed, reflect a clear understanding of the requirements, and are consistent with other portions of the offeror's proposal. Your prices do not seem to be realistic for the work to be performed or reflect a clear understanding of the work to be performed.

As to this perceived deficiency, the letter instructed IOS to "explain and provide back-up documentation as to how you arrived at the price and how you can successfully perform in accordance with the Statement of Work (SOW) at that price."

On July 23, 2004, IOS responded to the contracting officer's request. In explaining its proposal price, IOS noted that it had previously processed DeCA coupons for a short period of time and stated that "[t]his past experience with the DeCA account is why we are very confident in our pricing, our ability to meet the requirements in the Statement of Work, and our expertise to implement and execute the plan." It further indicated that its "bid was based on the incremental cost of processing DeCA coupons," an approach IOS assertedly had employed because the plant at which it intended to process DeCA coupons "has excess installed

capacity that will be more than adequate to process the estimated DeCA volume." An accompanying chart revealed estimated incremental costs of [ ] and estimated fees of [ ], of which [ ] was to derive from processing an estimated 200 million coupons at [ ] per thousand, and [ ] was to derived from the special handling of 20 million coupons at [ ] per thousand. The response further noted that IOS proposed to use "the same plant that processed DeCA coupons from 1995–2000," and that "[m]any of the same management and direct labor personnel still are employed." [2]

Recognizing, as the contracting officer had asserted, that its revenue projections were heavily based upon the receipt of a high volume of special handling fees, IOS also described in its response why it felt its reliance on those fees was reasonable:

> Special handling fees have become common as a way to recover some of the increases associated with ... hard to handle coupons. Based on our experience with other accounts, the average amount of special handling fees that will be paid by manufacturers is [ ]/1000. The billing of special handling fees will be only on coupons not scanned. For calculation purposes, we estimate that 10% of DeCA coupons will not be scanned and therefore will have special handling added to these invoices.

Attempting further to assuage DeCA's concerns in this regard, IOS additionally indicated that "our bid price is actually higher on this bid than it was on the previous UCCH bid from 2000 considering all the bid components," and that its current bid "is consistent with other retailers we process of similar volume and program requirements." [3]

DeCA was not satisfied with this response because, *inter alia*, the reference only to incremental costs, in its view, still prevented it from determining whether there was adequate assurance that the contract would be

---

**2.** The plant referenced in this statement was previously owned by United Coupon Clearing House (UCCH), which firm plaintiff bought in November of 1999. At the time of this acquisition, UCCH was in the last few months of a prior contract to process DeCA coupons.

**3.** The UCCH proposal, to which plaintiff referred, was made around the time plaintiff purchased UCCH in November of 1999. This contract instead was awarded to NCH, effective in January 2000.

profitable to plaintiff. Accordingly, the contracting officer requested additional information from IOS. Her letter, dated September 8, 2004, stated that "after reviewing [IOS'] proposal revision, ... DeCA is still concerned with [IOS'] ability to successfully perform at the unit prices proposed, based on historical prices [DeCA] has experienced in the last 10 years." This letter raised a number of issues, among them:

— It appears IOS is ... counting on special handling fees and potential postage reimbursements to cover overall cost of performance.... The line items for Postage and Shipping/Handling Fees is not guaranteed and should not be considered when determining your cost. If DeCA does not receive the postage and handling fees from the manufacturers then it will not be paid to IOS. Please acknowledge that you understand that postage reimbursement and special handling fees are only reimbursed to IOS for the amount that the manufacturers pay to DeCA.

\* \* \* \* \* \*

— You also stated that your bid (proposal) price is actually higher than it was on the previous UCCH bid from 2000 considering all the bid components. What bid components are you considering? The final proposal submitted ... when looking at unit price per 1000 coupons processed ranged from [ ] to [ ], which is higher than the amount you submitted. Please explain.

\* \* \* \* \* \*

— You stated that the bid is consistent with your other retail clients. The references you provided would not disclose the pricing information, therefore, can you provide the name and price per 1,000 coupons for at least three (3) references that are similar to DeCA.

The letter concluded that "[y]our response shall be received no later than 12:00 noon on September 20, 2004," and that "[r]esponses received after the above date and time will be considered late, which may render them ineligible for consideration for contract award."

On September 17, 2004, IOS responded to this second inquiry. Yet, it provided neither the requested customer names nor a breakdown of its prices on its other retail contracts, so as to allow DeCA to ascertain whether similarly-priced contracts had, in fact, generated acceptable revenue streams. Rather, emphasizing, as it had before, that it "understood fully that special handling and shipping reimbursements from the manufacturers are not guaranteed," IOS reiterated that it could turn a profit, stating that it could not "ignore what the facts have shown us over the past years." Regarding DeCA's observation that IOS' price proposal appeared to be lower than on the UCCH proposal in 1999, IOS responded—

To clarify our statement that our pricing is actually higher than it was on the previous ... bid, we did assume the maximum amount of the shipping budget could be collected. In the previous bid, the average price per 1000 coupons for the 4 year period was [ ] and the budget shipping reimbursement was [ ] per 1000. The potential revenue was [ ] per 1000 coupons. In our current bid, the base processing rate is [ ] and the budget shipping reimbursement is [ ] per 1000 coupons. The potential revenue is [ ]. Although the revenue has shifted from fees to the shipping reimbursement the net effect remains the same.

It continued—"[a]gain, we understand that the shipping is not guaranteed. The fact that you have over the past years increased the budgeted shipping number to more closely reflect the amounts actually paid by the manufacturers indicates that your history tells the same story."

In response to questions regarding IOS' earlier claims that the prices offered to DeCA for its coupon processing program were consistent with other accounts of similar nature and size, IOS declined to provide specific pricing information, stating "[o]bviously, this is privileged information." Instead, it attached to its response a certified statement that listed data for what it asserted were four actual customers, which statement, in chart form, indicated:

| Retailer | Approx. Annual Volume | Processing Fee + Shipping Reimbursement |
|---|---|---|
| A | [ ] | [ ] |
| B | [ ] | [ ] |
| C | [ ] | [ ] |
| D | [ ] | [ ] |

As the above chart reflects, IOS indicated in its response that it had "combined processing, special handling, and shipping reimbursement for your consideration;" it thus did not specify what portion of the dollar figures listed in its chart related to special handling and shipping reimbursement.

The record reflects that, after receiving IOS' second response, the contracting officer consulted with the Contract Review Board (CRB) to discuss whether she could make a best value trade-off between NCH and IOS. The CRB advised the contracting officer that since a price realism determination of IOS' offer could not be made, owing to plaintiff's failure to supply the appropriate information, a best value trade-off could not be pursued. The CRB recommended that the contracting officer determine if IOS should be eliminated from the competitive range, since it no longer had a reasonable chance of being selected.

Subsequently, as stated in an internal memorandum dated February 9, 2005, the contracting officer determined that she would eliminate IOS' proposal in accordance with Federal Acquisition Regulations (FAR), 48 C.F.R. §§ 15.306(c)(3) and 15.306(d).[4] The memorandum summarized the results of the two rounds of discussions with IOS. Commenting on the first round, it stated—

> The information provided by IOS in its response to the DeCA questions concerning the reasonableness of its price was not sufficient to allay DeCA's concerns. In its response to the first letter from DeCA,

IOS submitted a simplified version of its cost analysis adding only incremental costs associated with additional DeCA volume. IOS' total estimated costs were substantially higher than the estimated revenue, the processing fees that IOS would receive from DeCA. To cover this cost differential, IOS included a special handling fee ([ ] per 1,000) that IOS expected to collect from the manufacturers, above and beyond the processing fees from DeCA. Because the special handling fees were not guaranteed income, but an estimate by IOS, the possibility remained that IOS' costs would exceeds its revenue and thus placed successful contract performance at risk.

Based on the foregoing analysis, the contracting officer found that the "information provided in the response with regards to the cost issue was not satisfactory."

The contracting officer also expressed dissatisfaction with IOS' response to DeCA's second request for information, explaining that—

> [t]he decision by IOS to rely on a reimbursement rate from manufacturers that is not guaranteed and contrary to historical data places an unacceptable risk on DeCA that as IOS costs exceed its reimbursement income that it will be unable to continue contract performance and thus adversely effect DeCA's ability to operate.

Commenting on IOS response to the request for customer information, the memorandum stated that "DeCA requested information of retailers by name and price per 1,000 coupons," but received instead "a list of four of its customers not identified by name, and . . . a price that was a combination of processing fees, special handling, and shipping reimbursement for DeCA's consideration." "The information was not what was requested," the memorandum found, and "was inadequate to determine price reasonableness

---

4. The latter reference apparently was to FAR § 15.306(d)(5), which states that—

> If, after discussions have begun, an offeror originally in the competitive range is no longer considered to be among the most highly rated offerors being considered for award, that offeror may be eliminated from the competitive range whether or not all material aspects of the proposal have been discussed, or whether

or not the offeror has been afforded an opportunity to submit a proposal revision (see 15.307(a) and 15.503(a)(1)).

FAR § 15.306(c)(3) provides, in relevant part, that "[i]f the contracting officer . . . decides that an offeror's proposal should no longer be included in the competitive range, the proposal shall be eliminated from consideration for award."

when compared to the proposal price submitted for DeCA." The February 9, 2005, memorandum concluded that—

[t]he contracting officer is concerned with IOS' ability to successfully perform the contract at the unit prices proposed. An unrealistic low price normally increases the risk of a successful contract completion and this is considered when making a best value decision. Based on the contracting officer's judgment, IOS' proposal and explanation [have] failed to address the Agency's concerns to establish the reasonableness of its price. IOS' proposal was, therefore, eliminated from the competitive range. It was determined that award to IOS would pose an unacceptable risk because the Government could not determine that IOS' price was reasonable.

On February 9, 2005, the contracting officer communicated this decision to IOS, stating in a letter that "[t]he Contracting Officer's decision to eliminate your proposal from further consideration was based on the fact that from the information you provided the Agency could not establish the reasonableness of your price."

On February 18, 2005, IOS protested the decision to eliminate its proposal from the competitive range to the Government Accountability Office (GAO). On May 25, 2005, the GAO denied the protest, holding that under the Solicitation's price realism analysis and the remainder of its terms, DeCA "could reject a proposal that lack price realism, or consider a proposal's lack of price realism in its source selection." The GAO further found that the risk of poor performance when a contractor performs with little or no profit under a fixed-price contract was "a legitimate concern that can be considered under a price realism analysis." Additionally, it concluded that DeCA reasonably found IOS' price to be unrealistic and to pose a significant risk of nonperformance.

On July 20, 2005, plaintiff filed a complaint with this court seeking: (i) a declaration that IOS is entitled to have its proposal included in the competitive range for the Solicitation; (ii) a permanent injunction of the contract award to winning bidder NCH until a new source selection decision is made; (iii) an order requiring defendant to terminate the award and re-open the competition process and make a new source selection; and (iv) a declaration that plaintiff is entitled to damages, costs, and attorneys' fees. On July 25, 2005, NCH moved to intervene on behalf of defendant, which motion the court promptly granted. Thereafter, the parties files cross-motions for judgment on the administrative record. The court heard oral argument on those motions on September 22, 2005.

## II. DISCUSSION

We begin with common ground. While the standard for deciding a motion for judgment on the administrative record, pursuant to RCFC 56.1, bears some threshold similarities to that governing a motion for summary judgment under RCFC 56, it is different in several core respects. Highlighting those differences, the Federal Circuit, in *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355 (Fed.Cir.2005), recently held that courts must "distinguish ... [a] judgment on the administrative record from a summary judgment requiring the absence of a genuine issue of material fact." *Bannum* observed that while RCFC 56.1(a) incorporates the provisions of paragraphs (a) and (b) of RCFC 56, it does not incorporate the succeeding paragraphs (c) and (d). This omission, the court found, was significant given that the latter paragraphs are the source of two principles commonly associated with summary judgment motions—that the existence of a genuine issue of material fact precludes a grant of summary judgment and that inferences be weighed in favor of the non-moving party. *Id.* at 1356–57. Because of this omission, the Federal Circuit held that the latter principles are inapplicable to a motion for judgment on the administrative record under RCFC 56.1. *Id.* at 1356 ("Notably, RCFC 56.1 does not incorporate RCFC 56(c) or (d), yet those subsections provide the basis for denying summary judgment based on a genuine issue of material fact, and for drawing inferences in favor of the non-moving party."). The appellate court thus made clear that, under RCFC 56.1, the existence of a fact question neither precludes the granting of a motion for judgment nor requires this

court to conduct a full blown evidentiary proceeding. Rather, such fact questions must be resolved by reference to the administrative record, as properly supplemented—in the words of the Federal Circuit, "as if [this court] were conducting a trial on [that] record." *Id.* at 1357; *see also Carlisle v. United States,* 66 Fed.Cl. 627, 630–31 (2005); *Doe v. United States,* 66 Fed.Cl. 165, 174–75 (2005).[5]

■ The approach carefully mapped by the Federal Circuit in *Bannum* makes particular sense given the deferential review conducted in cases such as this. In a bid protest case, this court will enjoin the government only where an agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (2000); *see also* 28 U.S.C. § 1491(b)(4) (2000). By its very definition, this standard recognizes the possibility of a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which "consider[s] the relevant fac-

tors" and is "within the bounds of reasoned decisionmaking." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); *see Software Testing Solutions, Inc. v. United States,* 58 Fed.Cl. 533, 538 (2003); *Gulf Group, Inc. v. United States,* 56 Fed.Cl. 391, 396 (2003). This court will interfere with the government procurement process "only in extremely limited circumstances." *C.A.C.I., Inc.—Federal v. United States,* 719 F.2d 1567, 1581 (Fed.Cir.1983) (quoting *United States v. John C. Grimberg Co., Inc.,* 702 F.2d 1362, 1372 (Fed.Cir.1983)).

■ It is the burden of the aggrieved bidder to demonstrate that the challenged agency decision is either irrational or involved a clear violation of applicable statutes and regulations. *Banknote Corp. of America,* 365 F.3d at 1351, *aff'g,* 56 Fed.Cl. 377, 380 (2003).[6] Further, "to prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen-*

---

5. In *Bannum,* the Federal Circuit noted that, in *Banknote Corp. of Am. Inc. v. United States,* 365 F.3d 1345, 1352–53 (Fed.Cir.2004), it had erroneously conflated the standards under RCFC 56 and 56.1, albeit in *dicta.* In this regard, the *Bannum* court stated that—

Although it never reached the factual question of prejudice, the *Banknote II* court added that it is the trial and appellate courts' task to "determine whether there are any genuine issues of material fact as to whether the agency decision lacked a rational basis or involved a prejudicial violation of applicable statutes or regulations." This language equates a RCFC 56.1 judgment to a summary judgment under RCFC 56 and is unnecessary to the *Banknote II* holding. Because the court decided the issue by an interpretation of the solicitation, *e.g.,* making a legal determination, the court in *Banknote II* did not need to consider whether the trial court overlooked a genuine dispute or improperly considered the facts of that case. *Bannum,* 404 F.3d at 1354. Prior decisions of this court have made the same error. *See, e.g., JWK, Int'l Corp. v. United States,* 49 Fed.Cl. 371, 387 (2001), *aff'd,* 279 F.3d 985 (Fed.Cir.2002). Indeed, while various decisions of this court refer to a "motion for summary judgment on the administrative record," *see, e.g., ManTech Telecom. & Info. Sys. Corp. v. United States,* 49 Fed. Cl. 57, 64–65 (2001), *aff'd,* 30 Fed.Appx. 995 (Fed.Cir.2002) (emphasis added), there is no such thing under RCFC 56.1, as properly construed.

6. In *Banknote,* the Federal Circuit expounded upon these principles, as follows:

Under the APA standard as applied in … [bid protest] cases, "a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation of procedure."
[*Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332 (Fed.Cir. 2001)]. When a challenge is brought on the first ground, the test is "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a 'heavy burden' of showing that the award decision had no rational basis." *Id.* at 1332–33 (citations omitted). "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Id.* at 1333. To establish prejudice under this second ground, a protester must show that there was a "substantial chance" it would have received the contract award absent the alleged error. *Emery Worldwide Airlines, Inc. v. United States,* 264 F.3d 1071, 1086 (Fed.Cir.2001); *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999).
*Banknote Corp.,* 365 F.3d at 1351; *see also Seattle Sec. Servs., Inc. v. United States,* 45 Fed.Cl. 560, 566 (2000); *Analytical & Research Tech., Inc. v. United States,* 39 Fed.Cl. 34, 42 (1997).

*eral Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996). To demonstrate prejudice, "the protestor must show 'that there was a substantial chance it would have received the contract award but for that error.'" *Alfa Laval Separation*, 175 F.3d at 1367 (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed.Cir.1996)). Finally, because injunctive relief is relatively drastic in nature, a plaintiff must demonstrate that its right to such relief is clear. *See Banknote Corp. of America, Inc.*, 56 Fed.Cl. at 380–81; *Seattle Sec. Servs., Inc.*, 45 Fed.Cl. at 566; *cf. Beta Analytics Int'l., Inc. v. United States*, 44 Fed.Cl. 131, 137 n. 10 (1999).

 In the case *sub judice*, plaintiff's proposal was eliminated from the competitive range because, despite two rounds of discussions, it failed to provide sufficient information to alleviate the contracting officer's concerns regarding the risks posed by its proposal. Contrary to plaintiff's claims, its proposal was not eliminated simply because its price was "too low" or "unrealistically low." To be sure, its low price—less than half that offered by its competitor, and well below the historical prices paid by DeCA under other contracts—triggered the agency concerns that led to the two succeeding information requests. But, ultimately, it was not plaintiff's price, but its incomplete answers to the requests that led to the demise of its proposal.

Certainly, under the Solicitation, it is beyond peradventure that the contracting officer was entitled to review the assumptions underlying plaintiff's price. Indeed, the Solicitation specifically directed her to perform a price realism analysis, stating:

**PRICE AND PRICE REALISM:** Proposals will be evaluated to determine whether offered prices are realistic in relation to the work to be performed, reflect a clear understanding of the requirements, and are consistent with other portions of the offeror's proposal.

Regarding price analyses, FAR § 15.403–3(a) indicates that "[t]he contracting officer is responsible for obtaining information that is adequate for evaluating the reasonableness of the price or determining cost realism, but the contracting officer should not obtain more information than is necessary ...." [7] This provision continues that "[i]f the contracting officer cannot obtain adequate information from sources other than the offeror, the contracting officer must require submission of information other than cost or pricing data from the offeror," which information shall include, "at a minimum, appropriate information on the prices at which the same item or similar items have previously sold, adequate for determining the reasonableness of the price." *Id.* Paragraph (a)(4) of § 15.403–3 warns that—

an offeror who does not comply with a requirement to submit information for a contract or subcontract in accordance with paragraph (a)(1) of this subsection is ineligible for award unless the HCA determines that it is in the best interest of the Government to make the award to that offeror, based on consideration of the following: (i) The effort made to obtain the data. (ii) The need for the item or service. (iii) Increased cost or significant harm to the Government if award is not made.

This provision was added in 1999, *see* 64 Fed.Reg. 51828 (1999), pursuant to Congress' directive in section 808(c) of Pub.L. No. 105–261, 112 Stat.1920, 2085 (1998), requiring the FAR to be amended "to provide that an offeror's compliance with a requirement to submit data for a contract or subcontract ... shall be a condition for an offer or to be eligible to enter into the contract or subcontract." *See also* H.R. Conf. Rep. No. 105–736, at 791 (1998).

---

**7.** Where, as here, a fixed-price contract is to be awarded, the "realism" of the offerors' proposed prices is not ordinarily considered, since a fixed-price contract generally places the risk and responsibility for contract costs and resulting profit or loss on the contractor. *See Human Resources Sys.*, Inc., 96–1 C.P.D. ¶ 35 at 5, 1995 WL 791692 (1995). However, "an agency at its discretion may ... provide for a price realism analysis in the solicitation of fixed-price proposals." *Carr's Wild Horse Center*, 2000 C.P.D. ¶ 210 at 4, 2000 WL 1474096 (1995). Various commentators have recognized that the FAR provisions discussing "cost realism" provide guidance in conducting price realism analyses, where the offeror's proposed prices are unrealistically low. *See Price Realism: A Thorny Issue*, 12 Nash & Cibinic Rep. ¶ 40 (1998).

Here, IOS was asked not once, but twice to provide information that would demonstrate its prices were realistic and that it understood the contract's requirements. Rather than fully answering the questions posed, plaintiff attempted to quell the contracting officer's concerns on its own terms, in particular, by emphasizing repeatedly that it understood the requirements. In response to the first request for information, IOS did not provide its complete pricing structure, but rather listed only its incremental costs—those costs assertedly over and above the costs that it was already incurring at the plant at which the coupon processing was to occur. These "incremental costs" raised more questions than they answered, as they totaled nearly [ ] more than the amount of revenue IOS projected to receive from its proposed base fee, thereby highlighting the heavy extent to which IOS was relying upon shipping and handling fees, which were not guaranteed under the contract. This response provoked a second series of questions, to which plaintiff's responses were even more evasive. For example, having previously averred that it had used a similarly pricing scheme with other retail clients, IOS was asked to provide the names and prices per thousand coupons for at least three such references. It, however, declined to provide the names of any such clients. And, in presenting the pricing information for four unidentified clients (identified only as retailers "A," "B," "C," and "D"), it listed a single figure that combined the base prices with the shipping handling charges. This prevented DeCA from determining whether the pricing structure in those four contracts was the same as that being offered and, specifically,

what percentage of revenue in these contracts was attributed to the recovery of shipping and handling fees. While IOS asserted that the requested pricing information was "privileged," it failed to explain then—or before this court—why, if it was keeping the names of its clients a secret, it could not provide a more detailed breakdown of the price structure of those contracts.

In light of these facts, this court cannot conclude that the contracting officer acted in an arbitrary and capricious fashion, or otherwise contrary to law, in finding that the information supplied by IOS was insufficient to allay her concerns. As this court has stated, "[t]he nature and extent of an agency's price realism analysis are matters within the agency's discretion." *Labat–Anderson, Inc. v. United States*, 50 Fed.Cl. 99, 106 (2001).[8] IOS asserts that the contracting officer abused her discretion essentially because she required verification that its pricing structure would supply a sufficient economic incentive for IOS to complete the contract successfully. Such verification, IOS contends, was unnecessary—the contracting officer already had ample indication that it understood the particulars of the contract and that it was a financially strong company, and she should have trusted that IOS would not have made an offer that it felt would prove unprofitable. But, while trust has its place, the law tends to be more skeptical, *see Morrison v. Olson*, 487 U.S. 654, 727, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) (Scalia, J., dissenting), as government contract cases rejecting blanket assurances perfectly illustrate.[9] More specifically, a

---

**8.** *See also Citywide Managing Servs. of Port Washington, Inc.*, 2001 C.P.D. ¶ 6 at 4–5, 2000 WL 33121998 (2000); *Hydraulics, Int'l, Inc.*, 2000 C.P.D. ¶ 149 at 11, 2000 WL 1371001 (2000); *OVM Medical, Inc.*, 99–1 C.P.D. ¶ 38 at 8, 1999 WL 73772 (1999); *see also* FAR § 15.404–1.

**9.** Agency decisions rejecting blanket statements to the effect that an offeror will meet or exceed certain contract requirements or specifications have been upheld in a variety of settings. *See, e.g., Applied Cos.*, 98–2 C.P.D. ¶ 52, 1998 WL 555433 (1998) (agency could substantially downgrade technical proposal score where offeror responded to information requests with "general statements of compliance"); *Lappen Auto Supply Co.*, 95–2 C.P.D. ¶ 68, 1995 WL 479666 (1995)

(blanket statement of compliance with product specifications were inadequate); *Discount Machinery & Equipment, Inc.*, 86–2 C.P.D. ¶ 378, 1986 WL 64156 (1986) ("a blanket offer of compliance is not an adequate substitute for detailed descriptive information requested for evaluation purposes"); *Amperif Corp.*, 84–1 C.P.D. ¶ 409, 1984 WL 44129 (1984) (exclusion of proposal upheld where proposal "parroted" the specifications and merely stated it would meet or exceed the minimum requirements); *see also* John Cibinic, Jr. & Ralph C. Nash, Jr., *Formation of Government Contracts* (hereinafter "Cibinic & Nash") 877–79 (3d ed.1998) (noting other cases where exclusion from competitive range was

host of cases reveals that the contracting officer here had every right to be concerned that, if IOS' economic assumptions regarding special processing fees ultimately proved faulty, the performance of the contract could be threatened—not simply because plaintiff lacked the understanding or capacity to perform well, but because it might lack the financial incentive and desire to do so.[10] These concerns were deepened by the fact that timely performance of the coupon processing function is essential to the fiscal integrity of a revolving fund used by DECA to purchase items for its various commissaries. Under the circumstances, the agency certainly was entitled to employ a version of the Reagan-era aphorism, *doveryai no proveryai*—"trust, but verify."

If anything, plaintiff's incomplete responses to the DeCA's information requests made matters worse, heightening the contracting officer's disquietude. Knowing that the contracting officer was uneasy about its reliance on shipping and handling fees, IOS asserted that the price it was offering in its proposal was higher than in UCCH's 1999 proposal—but, its answer revealed otherwise, as the portion of the earlier price that related directly to coupon handling was much higher and that which related to shipping and handling actually was much lower. IOS asserted

that it had offered similarly-structured prices to other retail clients—but, it would not reveal the names of those clients or even the nature of the pricing structure employed for the unnamed retailers. Given such answers, this court hardly can hold that the contracting officer acted irrationally in concluding that her concerns had not been addressed. Contrary to plaintiff's claims, that an evaluation panel rated its performance capability as "very good" did not obviate these concerns, as the capability factor focused primarily on whether plaintiff had the technical capacity and personnel to perform the contract, and not on whether, if revenues failed, plaintiff still would use that capacity and personnel to perform the contract in timely fashion.

Indeed, in claiming that it offered adequate assurances here, plaintiff primarily offers little more than mere disagreements with the contracting officer's assessment of the risks associated with its proposal. "Such naked claims," this court often has stated, "by all appearances unsupported by anything in the record, fall far short of meeting the heavy burden of demonstrating that these findings were the product of an irrational process and hence arbitrary and capricious." *JWK Int'l Corp. v. United States*, 52 Fed.Cl. 650, 660 (2002); *see also E.P. Prods. v. United States*, 63 Fed.Cl. 220, 226 (2005); *Bank-*

---

held justified based upon the failure to provide requested information).

**10.** *See Pacific Ship Repair and Fabrication, Inc.*, 98–2 C.P.D. ¶ 29 at 7, 1998 WL 412421 (1998) ("the risk of poor performance when a contractor is forced to provide products or services at little or no profit is a legitimate concern in evaluating proposals"); *see also, e.g., Groves Resource Solutions, Inc.*, 2005 C.P.D. ¶ 133 at 3, 2005 WL 1551222 (2005); *Sabreliner Corp.*, 2000 C.P.D. ¶ 68 at 6–7, 2000 WL 526774 (2000); *The Arora Group*, 98–1 C.P.D. ¶ 64 at 4, 1997 WL 842951 (1998); *Tecom, Inc.*, 97–1 C.P.D. ¶ 221 at 5, 1997 WL 334940 (1997); *Cardinal Scientific, Inc.*, 96–1 CPD ¶ 70 at 4, 1996 WL 56290 (1996); *PHP Healthcare Corp.*, 93–1 CPD ¶ 366 at 5, 1993 WL 158287 (1993). In this regard, Professors Nash and Cibinic have commented:

An unrealistically low price can indicate that the offeror does not understand the work to be done. However, such a conclusion is not inevitable because the offeror might have intentionally offered a low price to win the competition (the so-called "buy-in"). In either case, acceptance of an unrealistically low price with a resulting lack of sufficient funds in the contract

may pose a risk of poor performance or even a lack of capability to perform (non-responsibility).

*Price Realism Analysis: A Tricky Issue, supra* at 108. Similarly, the Contract Pricing Guide, Volume 1, Price Analysis, which is referenced in FAR § 15.404–1(a)(7), states that an unrealistically low price "puts both parties at risk," noting that "[t]he risk to the Government is that the firm—to cut its losses—might: [c]ut corners on product quality; [or] [d]eliver late." *See also Contract Prices: What is a "Fair and Reasonable Price"?*, 15 Nash & Cibinic Rep. ¶ 22 (2001). As these authorities would suggest, plaintiff is simply wrong in asserting that *CC Distributors, Inc. v. United States*, 65 Fed.Cl. 813 (2005) holds that an agency should not be concerned with a "low price" unless it relates to responsibility. While the court indicated there that a low price could raise issues regarding responsibility, it did not foreclose the possibility that such a price reasonably could raise other types of concerns, including the possibility that a perfectly capable contractor would perform less than adequately on what proved to be an unprofitable contract.

*note Corp.*, 56 Fed.Cl. at 384; *Carlson Wagonlit Travel*, 2001 C.P.D. ¶ 49 at 3, 2001 WL 254317 (2001) ("an offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably"). Even were it not to afford deference to the agency's determinations here, this court readily would conclude, based upon the administrative record, that IOS did not provide adequate information to allow DeCA to determine whether and to what extent it had used the same form of pricing in other contracts and, if so, how those contracts fared. In short, within the meaning of the Solicitation and the FAR, it never showed that its price was realistic.

Perhaps sensing the poverty of its other arguments, IOS now claims, in essence, that it would have done things differently had it known that its incomplete responses exposed it to being eliminated from the competition. It points out—correctly—that unlike some solicitations, the instant one did not explicitly warn offerors that the failure to respond to particular information requests would lead to proposals being excluded. But, this assertion has a decidedly hollow ring for a whole range of reasons.

First, at least since 1999, § 15.403–3(a)(4) of the FAR has made clear that an offeror who does not comply with a request, under FAR § 15.403(a)(1), to submit pricing information for a contract may be "ineligible for award." While admitting, at oral argument, that this provision applied to this procurement, plaintiff asserts that, thereunder, it could be declared ineligible for award only if its failure to comply was "wilful." But, this assertion comes from the ether—it is unsupported by anything in either the language or structure of the FAR provisions at issue or the underlying statute that gave rise to the regulation. Moreover, under another set of FAR provisions, plaintiff plainly was on no-

tice that it could be "eliminated from the competitive range" if its responses to DeCA's requests led its proposal to "no longer [be] considered ... among the most highly rated offerors being considered for award." FAR § 15.306(d)(5); *see also id.* at § 15.306(c)(3); *OVM Medical*, 99–1 C.P.D. ¶ 38 at 7, 1999 WL 73772 (1999) (offeror that failed to provide adequate information in response to questions stemming from a price realism analysis was properly excluded from the competitive range). Of course, it is these provisions that actually were invoked by the contracting officer here.

Finally, wholly apart from these regulations, various cases hold that where, under a solicitation or the FAR, a contracting officer is responsible for obtaining information to allow for a particular evaluation to be made as a condition of an award, the failure of an offeror to furnish information in response to the contracting officer's requests constitutes a basis upon which to exclude the offeror from the procurement or the award. *See, e.g., 50 State Security Serv. Inc.*, 96–2 C.P.D. ¶ 123 at 6–7, 1996 WL 538660 (1996) (contracting officer properly excluded protestor from competition where protester failed to provide promptly requested proof that it would be able to comply with performance schedule); *Whittaker Electronic Sys.*, 92–2 C.P.D. ¶ 161 at 8–9, 1992 WL 232631 (1992) (upholding agency finding that offer was technically unacceptable based upon offeror's failure to provide requested information; offeror "assumed the risk that the agency would draw and adverse inference"); *Matter of Manufacturing Syss. Int'l, Inc.*, 84–1 C.P.D. ¶ 586, 1984 WL 46764 (1984) (offeror "must suffer the consequences of [its] failure" to provide information requested by an agency); *see also Matter of Southeastern Enterprises, Inc.*, 91–2 C.P.D. ¶ 514, 1991 WL 269785 (1991); *Matter of Indus. Maintenance Servs., Inc.*, 89–2 C.P.D. ¶ 324, 1989 WL 241224 (1989).[11] These cases proceed

11. Plaintiff asserts that it should not have been eliminated from the competitive range under FAR § 15.404–1(d)(3), which provides that the results of a "cost realism" analysis "may be used in performance risk assessments and responsibility determinations." But, assuming this regulation applies to a "price realism" analysis, it remains that while section 15.404–1(d)(3) tells an agency what it "may" do with the results of such an analysis, it does not suggest either that the list of responses to the results of such an analysis is exclusive or that other, overlapping provisions of the FAR might not authorize other responses. *Cf. First Enterprise v. United States*, 61 Fed.Cl. 109, 123–25 (2004).

from the eminently logical premise that, even without an explicit warning, an offeror should know that its failure to provide requested information necessary to allow an agency to make a determination that is required either for evaluation or award will prevent it from receiving an award.

This is not to say that a minor informational deficiency in a response to a lone agency request invariably should lead to a proposal being eliminated from the competitive range—and that is not the case here. Having received, as part of extensive discussions, not one, but two inquiries regarding its prices, plaintiff undoubtedly was aware of the seriousness of the matter and, in the court's view, was on notice that it risked elimination if, for a second time, it failed to answer specifically the questions the agency had posed to alleviate its concerns.[12] Certainly, plaintiff could not reasonably expect that, having twice failed to receive complete answers to its questions, the agency would either conduct additional rounds of discussions—a third or fourth request for information, perhaps—or passively abandon its inquiry. For this court to hold otherwise would be to encourage offerors to play a tight-lipped form of "cat and mouse" with agency information requests—gamesmanship that makes no sense generally and particularly not in the confines of the explicit and implicit directions of the FAR.

## III. CONCLUSION

In the interests of rendering a prompt decision, this court need go no further. Measured by the appropriate standard of review, DeCA's conduct here was not erroneous. The injunctive relief requested by plaintiff, therefore, is not appropriately granted.

In consideration of the above:

1. Plaintiff's motion for judgment on the administrative record is **DENIED** and defendant's cross motion for judgment on the administrative record is **GRANTED.**

2. The Clerk is directed to dismiss the complaint.

3. This opinion shall be published as issued after November 23, 2005, unless the parties identify protected and/or privileged materials subject to redaction prior to said date. Said materials shall be identified with specificity, both in terms of the language to be redacted and the reasons for that redaction.

**IT IS SO ORDERED.**

---

12. Though an agency's decision that results, as here, in a competitive range of only one offeror is subject to close scrutiny, such decisions have been upheld in numerous circumstances. *See* Cibinic & Nash, *supra,* at 880 (citing numerous cases).