**RISC MANAGEMENT JOINT VENTURE, Plaintiff,**

v.

**UNITED STATES, Defendant,**

**Valley Garbage & Rubbish Co., Inc. d/b/a Health Sanitation Service, Inc., Intervenor–Defendant.**

**No. 05–488C.**

United States Court of Federal Claims.

Filed Under Seal: Feb. 17, 2006.

Reissued: Feb. 24, 2006.

Johnathan M. Bailey, Bailey & Bailey, P.C., San Antonio, TX, for plaintiff.

James D. Colt, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Kathryn A. Bleecker, Assistant Director, Commercial Litigation Branch, Washington, D.C. Of counsel was Major Lawrence Anderson, Commercial Litigation Division, United States Air Force, Arlington, VA.

Neil H. O'Donnell, Rogers Joseph O'Donnell & Phillips, San Francisco, CA, for intervenor-defendant Health Sanitation Service, Inc. With him on the briefs was Mark A. Kahn, Rogers Joseph O'Donnell & Phillips, San Francisco, CA.

## OPINION AND ORDER [1]

LETTOW, Judge.

Plaintiff, RISC Management Joint Venture ("RISC"), filed this action to challenge a decision by the U.S. Air Force to select intervenor-defendant, Health Sanitation Service, Inc. ("HSS"), for award of a contract to provide solid waste management services at Vandenberg Air Force Base ("Vandenberg") in California.[2] RISC is a joint venture between Red River Service Corporation and Inland Service Corporation ("Inland Service"). AR 380 (RISC Volume III: Oral Technical Proposal (undated)).[3] HSS is a wholly owned subsidiary of Waste Management, Inc., which purchased HSS in 1999. Hr'g Tr. 38:17 to 39:18, 102:3–7 (Apr. 29, 2005).[4] RISC and HSS were the only bidders on the Air Force contract that encompassed the solid waste, refuse, and recycling services, as well as the environmental management of the Class III unlined sanitary landfill, at Vandenberg. HSS was selected for the award notwithstanding the fact that it proposed a higher contract price than RISC, primarily on the basis of HSS's higher past performance and confidence ratings.

After a hearing on April 29, 2005 on RISC's application for a temporary restraining order, the court denied that application. Since May 1, 2005, HSS has been fulfilling the requirements of the contract at issue.

Pending before the court are the government's and HSS's motions and RISC's cross-motion for judgment on the administrative record. On January 19, 2006, the court completed the record for decision by hearing arguments on the motions and conducting a trial concerning equitable issues. For the reasons set forth below, the court concludes that the government erred in certain respects in acting on the procurement but that those errors were not significant and did not prejudice RISC's posture in the procurement. In short, the Air Force's decision to award the pertinent contract to HSS was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A), and it should not be set aside.

## FACTS [5]

On May 19, 2004, the Air Force announced that it intended to issue a solicitation for all solid waste management services and for the operation of the Class III landfill at Vandenberg. AR 5–6 (Presolicitation Notice (May 19, 2004)). Previously, two separate contracts had been issued for the landfill's operation, waste collection, and attendant environmental sampling and reporting. *See* AR 250 (Pre–Proposal Conference/Site Visit (Aug. 31, 2004)), 257 (Pre–Proposal Conference/Site Visit Handout (Aug. 31, 2004)) (comment by Mr. Patrick Maloy, Environmental Advisor and Solid Waste Manager at Vandenberg, that two different contractors had previously been retained to provide the required environmental sampling, analysis, and reporting that was encompassed by the Solicitation). Under the first of these two

---

1. Because this decision might have contained "confidential or proprietary information" within the meaning of the Rules of the Court of Federal Claims ("RCFC") Appendix C, ¶ 4, it was initially issued under seal. The parties were requested to file proposed redactions by February 23, 2006. *See infra*, at 638. No such redactions were proposed.

2. The court granted a motion by HSS, the successful bidder for the contract, to intervene in this proceeding as a defendant pursuant to RCFC 24(a)(2). Order of April 29, 2005.

3. "AR" refers to the Administrative Record filed with the court respecting the procurement. "Hr'g Tr." without an attendant date refers to the transcript of the hearing conducted in this matter on January 19, 2006.

4. As explained by counsel for intervenor-defendant, "Waste Management itself is a holding company which operates through local operating entities," one of which is HSS. Hr'g Tr. 38:17–21 (Apr. 29, 2005). "[W]herever it operates in the country, Waste Management operates both as whatever the company is, [HSS] in this case, a Waste Management company, and is known both by Waste Management and by the name of the local operating entity." *Id.* 38:21 to 39:1. Finally, the resources of both the parent company and subsidiary are available for any particular project. *Id.* 39:2–6.

5. The factual recitations that follow are drawn from the Air Force's Administrative Record of the procurement and from evidentiary submissions by the parties related to prejudice and equitable factors.

contracts, RISC had provided solid waste management services that included "refuse, recycling, green waste and bulk pickup," operation of the Class III landfill at Vandenberg, and "operation and maintenance of the [g]roundwater [r]eclamation & [c]onditioning [s]ystem." AR 281 (Summary of RISC's Vandenberg Contract (Jan. 17, 2005)); *see* AR 455–457 (Contractor Performance Assessment Report (April 15, 2004)). The second contract was performed by Tetra Tech, Inc. ("Tetra Tech") and largely encompassed "environmental sampling, monitoring, reporting and compliance efforts." AR 957 (Proposal Evaluation Report § 4.1(b)(1) (Mar. 15, 2005)); *see* Hr'g Tr. 22:17 to 23:3. The two contracts required coordination by the Air Force to provide the requisite environmental management for the landfill, AR 957 (Proposal Evaluation Report § 4.1(b)(1)), and the Air Force sought to consolidate responsibilities for those services in a single contract. *Id.;* see also Hr'g Tr. 41:2–14.

A. Scope of the Solicitation

The Air Force issued Solicitation No. FA4610–04–R–0006 on August 20, 2004 for waste management services and operation and management of the unlined Class III sanitary landfill at Vandenberg. AR 7 (Solicitation (Aug. 20, 2004)). Ten amendments were subsequently issued to revise aspects of the Solicitation, including the response date, *see, e.g.,* AR 215–16 (Solicitation Amendment 0008 (Jan. 3, 2005)), various terms, AR 123–131 (Solicitation Amendment 0009 (Jan. 10, 2005)), and estimated quantities for some items. AR 120–121 (Solicitation Amendment 0010 (Jan. 18, 2005)).

The Solicitation contemplated that a firm-fixed price contract would be awarded for a term of six months, from April 1, 2005 through September 30, 2005, AR 1 (Request for Purchase (Dec. 14, 2004)); *see* AR 123–131 (Solicitation Amendment 0009),[6] with four additional single-year options. AR 124–26, 128–29 (Contract Line Item Numbers ("CLINs") 0001, 1001, 2001, 3001, 4001). The Solicitation called for a contractor to "collect, transport, recycle, and dispose of municipal solid wastes" at the Class III land-

fill at Vandenberg in compliance with local, state and federal regulations. AR 59 (Statement of Work § 1.0); *see* AR 59–67 (Statement of Work §§ 1.1–4.5.3) (itemizing and describing all of the contractor's responsibilities). The contractor would provide all personnel, tools, materials, supplies, equipment, and supervision necessary to perform the duties under the contract excepting only items listed in an appendix to the Solicitation. AR 59 (Statement of Work § 1.0); *see* AR 65 (Statement of Work §§ 3.0–3.3), 78 (Appendix # 2: Government–Furnished Facilities and Equipment).

The Statement of Work set out six main areas of responsibility under the contract. *See* AR 59–67 (Statement of Work §§ 1.1–4.5.3). The first, operation of the base municipal solid waste landfill, required that the contractor "manage, operate, monitor and control the" landfill. AR 59 (Statement of Work § 1.1); *accord* AR 9 (CLIN 0001). Under the applicable Solid Waste Facility Permit, issued by the California Regional Water Quality Control Board, the landfill could accept a maximum of 400 tons of solid waste per day although it had averaged 50 tons per day. AR 59 (Statement of Work § 1.1). Moreover, besides Vandenberg, the landfill also accepted refuse and waste from the Lompoc Federal Correction Institute, the U.S. Penitentiary, and various affiliated Vandenberg organizations which included authorized contractors. *Id.* In addition to properly disposing of various types of solid waste, the contractor would be required to "sample the groundwater, soil pore liquid, soil pore gas and surface water at specific locations in and around the landfill" and report the results in accordance with all relevant permits. AR 60 (Statement of Work § 1.1.20); *see also* AR 61 (Statement of Work § 1.1.22) (stating that the contractor would perform "gas and water sampling and submit all required reports").

Second, the contractor would be responsible for "provid[ing] refuse, recycling, and green waste collection services to" Vandenberg. AR 61 (Statement of Work § 1.2); *see* AR 9–11 (CLINs 0002–0005), 79 (Appendix # 3: Recyclable Materials)(listing categories

---

6. Prior to Amendment 0009, the Air Force intended for the contract's base period to run from

October 1, 2004 through September 30, 2005. AR 6 (Presolicitation Notice).

of recyclable materials). Third, in the event solid waste could not be disposed of through recycling or deposition in the landfill, the contractor would be responsible for identifying potential contaminated items and transporting them off the base in accordance with applicable permits and regulations. AR 62 (Statement of Work § 1.3) (providing as examples of contaminated solid waste: overseas waste, bio-hazardous waste, and etiologic agents). Fourth, the contractor would be required to establish and enforce a plan to provide quality assurance for the contract. *Id.* (Statement of Work §§ 1.4.1–2). Such a plan would incorporate criteria and schedules for inspections, a system to identify recurrent problems, and a method to record relevant data. *Id.* (Statement of Work § 1.4.1). Fifth, the contractor would be responsible for environmental reporting and management, and compliance with applicable local, state and federal environmental regulations. AR 62 (Statement of Work § 1.5), 63 (Statement of Work §§ 1.6–1.6.1); *accord* AR 12 (CLIN 0008); *see* AR 81–91 (Appendix # 5: Environmental Compliance), 92–105 (Exhibit A: Contract Data Requirements List). Finally, the contractor would ensure that the government's property was being properly maintained, controlled, secured and preserved. AR 63 (Statement of Work § 1.7).

## B. Requirements for Proposals

Interested bidders were required to make submissions in three areas as part of their proposals: past performance information and references, executed contractual documentation including price proposals for each CLIN, and a technical presentation in oral form. AR 41–42 (Addendum 3 to Federal Acquisition Rule ("FAR") [48 C.F.R. § ] 52.212–1).

Overall, the government would obtain past performance information about an offeror from three sources: the offeror itself, directly from references, and through its own research. AR 42 (Addenda 5.b, c to FAR 52.212–1). First, an offeror was instructed to submit descriptions of no more than five of its own contracts, performed within the past three years, including such information as for whom the contracts were performed, the periods of performance, the contract prices, and a brief summary of each contract's requirements. AR 157–58 (Amended Addendum 5.c to FAR 52.212–1). In addition, the government requested that an offeror submit relevant past performance information for all proposed subcontractors "if they w[ould] be performing major or critical aspects of the requirement[s] for this acquisition." AR 42 (Addendum 5.c to FAR 52.212–1). An offeror was to include a description and percentage of the work that a subcontractor would be performing. *Id.* Second, an offeror was instructed to provide its references with a Past Performance Questionnaire that was to be completed and sent by the references directly to the Contracting Officer. AR 158–59 (Amended Addenda 5.g, h to FAR 52.212–1); *see* AR 115–119 (Attachment # 3: Past Performance Questionnaire). Finally, the government itself would obtain information on an offeror's past performance from other Federal government agencies and commercial entities, AR 42. (Addendum 5.b to FAR 52.212.1), by accessing the Past Performance Information Retrieval System ("PPIRS") and Construction Contractor Appraisal Support System ("CCASS"). *See, e.g.,* AR 952 (RISC PPIRS/CCAS Past Performance Information).[7]

Past performance information would be assessed with respect to three factors: recency, relevancy, and quality. AR 42 (Addendum 5.a to FAR 52.212–1). Recency was defined as any on-going contract or other contract completed within three years of the issuance of the Solicitation. *Id.* "Relevant" work was that which was the *"same* or *similar* in complexity and scope to the Solid Waste Management requirements identified" in the Solicitation. *Id.* (emphasis in original). Relevant past performance included any contract for the "[c]ollection, handling and disposal" of more than a thousand "refuse/recycling industrial and residential containers per month" that was the "[s]ame or similar in complexity to the current" management contract of the Vandenberg landfill insofar as environmental regulation was concerned. *Id.*

---

7. Both PPIRS and CCASS are automated government information systems that store prior performance evaluations of government contractors.

*See J.C.N. Constr. Co. v. United States,* 60 Fed.Cl. 400, 406–10 (2004), *aff'd,* 122 Fed.Appx. 514 (Fed.Cir.2005).

If an offeror or one of its subcontractors had little or no relevant past performance, the bidder could instead submit past performance information on key personnel. AR 43 (Addendum 5.e to FAR 52.212–1). Finally, quality was defined as being "part of the evaluation to help determine 'how well' the offeror performed" in the past. AR 42 (Addendum 5.a to FAR 52.212.1).

After evaluating all of the information received from an offeror and third parties, the Contracting Officer would assign that offeror a confidence rating based on her assessment of the company's past performance in accordance with Air Force FAR ("AFFARS") 5315.305(a)(2)(E) (Feb. 5, 2004). AR 45 (Addendum 4 to FAR 52.212–2), 46 (Addendum 5.a to FAR 52.212–2).[8] The rating would reflect "the government's confidence in [an] offeror's probability of successfully performing as proposed." AR 46 (Addendum 5.a to FAR 52.212–2). If no relevant and recent past performance existed, a confidence rating of Neutral/Unknown Confidence would be assigned to the company. AR 43 (Addendum 5.e to FAR 52.212–1). Such a rating would not automatically disqualify an offeror, but that rating would be a factor considered in the ultimate performance-price trade-off. *Id.*

Price and proposal documents, including a pricing schedule for each CLIN and completed certifications and responses to the amendments to the Solicitation, had to be included in a bidder's response to the Solicitation.

AR 43 (Addendum 6 to FAR 52.212–1). Overall, an offeror would propose a "total evaluated price" that would be the sum of the base period price plus the price for each CLIN in each option year. AR 162 (Addendum 5.b to FAR 52.212–1). The government would evaluate the proposed price by comparing it to the prices submitted by each of the other offerors to determine whether the offeror had a "clear understanding of the [contract's] requirements." AR 46 (Addendum 5.b to FAR 52.212–2), 162 (Amended Addendum 5.b to FAR 52.212–2).[9]

Finally, an offeror, through the project's proposed manager and any other key personnel, would make an oral technical presentation to the government's evaluation team. AR 43 (Addendum 7.a to FAR 52.212–1).[10] In the technical presentation, an offeror was to discuss its organizational structure "includ[ing the] line and level of authority for solid waste management," AR 44 (Addendum 7.b(1) to FAR 52.212–1), and address its "understanding and ... approach to achieving performance objectives" that included "[c]omply[ing] with the regulations, permits, plans or other compliance operating documents governing the [Vandenberg] landfill" and "[c]ollection of refuse, recycle and green waste." *Id.* (Addendum 7.b(2) to FAR 52.212–1).

In evaluating the submitted proposals, the government would first assess the technical capability of the offerors and determine whether the parties were technically accept-

---

**8.** Six different ratings were available to the Contracting Officer in evaluating each offeror: (1) "Exceptional/High Confidence" meaning "no doubt exists that the offeror will successfully perform the required effort;" (2) "Very Good/Significant Confidence" meaning "little doubt exists that the offeror will successfully perform the required effort;" (3) "Satisfactory/Confidence" meaning "some doubt exists that the offeror will successfully perform the required effort;" (4) "Neutral/Unknown Confidence" *indicating that* "[n]o performance record [is] identifiable;" (5) "Marginal/Little Confidence" meaning that "substantial doubt exists that the offeror will successfully perform the required effort [and that c]hanges to the offeror's existing processes may be necessary in order to achieve contract requirements;" and (6) "Unsatisfactory/No Confidence" meaning that "extreme doubt exists that the offeror will successfully perform the required effort." Table 5315–2, AFFARS 5315.305(a)(2)(E) (Feb. 5, 2004) (ratings revised effective Oct. 1, 2004).

**9.** The Air Force had *independently estimated the* price to operate the landfill and otherwise perform the requisite tasks under the Solicitation. AR 265–276 (Independent Government Estimate (Feb. 18, 2004)). The Air Force's estimated price for the base period and all four option years, $13,513,600, was "determined from evaluating current and previous delivery contracts and industry standards" and information obtained from the Base Solid Waste Manager and Environmental Flight. *Id.*

**10.** The evaluation team was comprised of five officials from the 30th Civil Engineer Squadron and 30th Contracting Squadron at Vandenberg. AR 945 (Proposal Evaluation Report (Mar. 15, 2005)).

able or unacceptable. AR 46 (Addendum 5.c to FAR 52.212–2). All technically acceptable offerors would then receive a confidence rating based on their past performance. Subsequently, the government would treat both past performance and price with equal weight and would employ the Performance–Price Trade-off ("PPT") technique to make a best-value decision. AR 45 (Addendum 4 to FAR 52.212–2); see AR 160 (Amended FAR 52.212–2(a)).[11] "The government reserve[d] the right to award a contract to other than the [the offeror with the] lowest evaluated price and award to a higher priced offeror with a better performance risk rating." AR 45 (Addendum 4 to FAR 52.212–2). The Solicitation also stated that the government intended to award the contract "without discussions with offerors," although it reserved the right to "conduct discussions if later determined by the Contracting Officer to be necessary." AR 39 (FAR 52.212–1(g)).

C. RISC's and HSS's Proposals

Both RISC and HSS attended a pre-proposal conference and site visit on August 31, 2004. AR 249 (Pre–Proposal Conference/Site Visit (Aug. 31, 2004)), 255 (Pre–Proposal/Site Visit Attendance Record (Aug. 31, 2004)). During this conference, representatives of the government explained the requirements for the solicitation and the manner in which an offeror would be selected for the award, and they provided an overview of the general project responsibilities, detailed all the environmental management and reporting requirements, and led a tour of the landfill itself. AR 249–253 (Pre–Proposal Conference/Site Visit).

RISC responded to the Solicitation on September 21, 2004, AR 340 (Letter from William J. Place, Executive Vice President, RISC, to Aimee Hamrick, Air Force (Sept. 21, 2004)), proposing an overall price of $7,834,959.72. Compl. ¶ 13; AR 297–377 (RISC Price Proposal). RISC indicated it would use five subcontractors for the following services: Coast Tire Recycling for tire disposal, Agri–Chip for wood grinding, Pellu Systems, Inc. ("Pellu") for leachate treatment and groundwater monitoring, ACE Engineering for rubble processing, and Rollins Falconry for bird (vector) control. AR 413 (RISC Oral Technical Proposal). Volume one of RISC's proposal, containing past performance information for itself and its subcontractors, subsequently was revised on January 17, 2005 to respond to an amendment of the Solicitation. AR 280 (Letter from Bob Alford, RISC, to Celeste Cappomagi, Air Force (Jan. 17, 2005)); see AR 281–296 (RISC Description of Past Performance). The government also received past performance questionnaires from various prior employers of RISC and its subcontractors, AR 572–659 (RISC's Contractor Performance Assessment Questionnaires), and evaluations from other government entities via PPIRS and CCASS. AR 446–571 (RISC's Contractor Performance Assessment Reports). Finally, as part of RISC's submission, it made an oral technical presentation. AR 378–445 (Oral Technical Proposal). As a result of the presentation, the Air Force evaluation team had three areas of concern that in due course "were [all] satisfactorily answered" by RISC. AR 955 (Proposal Evaluation Report § 2.1(b)(3)).

On March 1, 2005, RISC responded to a verbal request from the Contracting Officer to provide references for one of RISC's proposed subcontractors, Pellu. AR 660 (Letter from Kelly B. Place, Director of Marketing, RISC, to Donna Chesher, Contracting Officer, Air Force (Mar. 1, 2005)). RISC submitted a summary of the individuals who comprised Pellu's Technology Group and a description of the unique water treatment process that Pellu employed. AR 662–63 (Background on Pellu). In addition, RISC submitted five references for Pellu, AR 664–66 (Pellu References), and requested that a summary which described Pellu's work for RISC at Vandenberg also serve as a favorable reference. AR 661 (RISC Reference for Pellu).

HSS submitted its proposal in accordance with all of the Solicitation's amendments on February 8, 2005, with a total evaluated price of $9,416,061.70. AR 679–793 (HSS Volume II: Price Proposal). As part of its

11. Under this approach, "price and performance risk are both treated as equal areas and may be traded off, one against the other." AR 45 (Addendum 4 to FAR 52.212–2).

proposal, HSS indicated that it would employ four subcontractors: SRS Technologies ("SRS") for environmental management, A–1 Tree Service for wood grinding, J.F. Will for rubble crushing, and Rollins Falconry for bird control. AR 795, 818, 824 (HSS Oral Technical Proposal), 948 (Proposal Evaluation Report § 2.1). HSS's past performance information was sent to the Contracting Officer on September 2, 2004. AR 668–678 (HSS Description of Past Performance). Additional past performance information for HSS and its subcontractors, consisting of work under three earlier government contracts, was obtained by the Contracting Officer via PPIRS and CCASS. AR 885–901 (HSS's Contractor Performance Assessment Reports). Past performance questionnaires were also received by the Contracting Officer from references for HSS and its subcontractors. AR 902–944 (HSS's Contractor Performance Assessment Questionnaires). Finally, HSS presented its oral technical proposal on February 23, 2005, AR 794–884 (HSS Oral Technical Proposal), and responded "satisfactorily" to two areas of concern that the Air Force's technical representatives had expressed. AR 950 (Proposal Evaluation Report § 2.1(b)(3)).

### D. The Contracting Officer's Evaluation of the Proposals

Following the submission of the parties' proposals and presentation of their technical capabilities, the Contracting Officer and her evaluation team reviewed the two offers. AR 945 (Proposal Evaluation Report § 1.3(a)). For its past performance, RISC received a confidence rating of "Very Good/Significant Confidence." AR 955 (Proposal Evaluation Report § 2.1(b)(1)(e)). The Contracting Officer evaluated RISC's past performance questionnaires and government assessment reports from 36 different projects and found all of them "recent," of which 22 were "relevant." AR 951–53 (Proposal Evaluation Report § 2.1(b)(1)). However, both Pellu and Rollins Falconry were found to have no relevant experience, and therefore they were neither rated favorably or unfavorably in accordance with the Solicitation. AR 953–55 (Proposal Evaluation Report §§ 2.1(b)(1)(b), (b)(1)(d)); see AR 43 (Addendum 5.e to FAR 52.212–1). As bird, i.e., gull or "[v]ector

control [wa]s a minor part of the contract," the Contracting Officer deemed the complete lack of past performance in that regard "insignificant and not a major concern." AR 954 (Proposal Evaluation Report § 2.1(b)(1)(d)). With respect to Pellu, however, the Contracting Officer concluded that the lack of relevant past experience "was a concern as environmental management [wa]s a critical part of the effort." AR 953 (Proposal Evaluation Report § 2.1(b)(1)(b)).

The Contracting Officer awarded HSS a confidence rating of "Exceptional/High Confidence." AR 950 (Proposal Evaluation Report § 2.1(a)(1)(e)). All ten past performance questionnaires that were submitted were "recent" and eight were deemed "relevant." AR 948 (Proposal Evaluation Report § 2.1(a)(1)). None of the three evaluations from the automated government information systems were found to be relevant. AR 949 (Proposal Evaluation Report § 2.1(a)(1)). As with RISC, the Contracting Officer concluded that Rollins Falconry did not have any pertinent past performance experience and therefore rated that proposed subcontractor neither favorably nor unfavorably, though it was "not a major concern." AR 950 (Proposal Evaluation Report § 2.1(a)(1)(d)).

Ultimately, the Air Force decided to select HSS for the award, rather than RISC, because "[i]t [wa]s determined to be in the best interests of the Government to trade off $1,581,101.98 for a High Confidence in the offeror being able to successfully complete the contract as proposed." AR 958 (Proposal Evaluation Report § 4.1(c)); see AR 277 (Memo from Chesher to Sandy Masterson, RISC (Mar. 28, 2005)) (stating that HSS was selected because it "received a higher confidence rating based on past performance information"). The Contracting Officer cited "the potential time and cost savings (less Government administration, oversight and rework) received by the Government['s] acquiring service of high quality." AR 958 (Proposal Evaluation Report § 4.1(c)). However, the "strong impetus" for the Contracting Officer to trade off a lower price for a higher confidence rating was "[t]he fact that the environmental portion [of the contract wa]s absolutely critical to the entire base."

*Id.; see* AR 957 (Proposal Evaluation Report § 4.1(b)(1)) (stating that most of the additional requirements in this contract, compared to the contract previously held by RISC, related to environmental sampling and reporting). The Contracting Officer noted that the Class III landfill at Vandenberg was the second most environmentally regulated facility on the base. AR 957 (Proposal Evaluation Report § 4.1(b)(1)). She supported her decision, and her emphasis on environmental management, on the basis that "[t]he past performance information for HSS' proposed subcontractor [for environmental management], SRS Technologies, was rated overall Very Good, while the team's assessment of past performance for RISC's proposed subcontractor, Pellu Systems, was [N]eutral due to [the] lack of relevant past performance." AR 958 (Proposal Evaluation Report § 4.1(c)); *compare* AR 948 (Proposal Evaluation Report § 2.1(a)(1))(finding that SRS was rated Very Good on a relevant and recent contract for environmental services), *with* AR 951–52 (Proposal Evaluation Report § 2.1(b)(1)) (finding that Pellu's three contracts were recent but not relevant). Finally, the Contracting Officer deemed HSS's proposed price to be "fair and reasonable" pursuant to FAR 15.404–1(b)(2)(i) after comparing it to RISC's proposed price. AR 958 (Proposal Evaluation Report § 4.1(d)).

HSS and the Air Force executed a contract to provide solid waste management services at Vandenberg on March 28, 2005. AR 965–1048 (Executed Contract (Mar. 28, 2005)).

### E. Subsequent Proceedings

On March 30, 2005, RISC filed a protest with the Government Accountability Office ("GAO") contending that the Air Force's "evaluation of RISC's past performance was unreasonable, and . . . that the [Air Force]'s best value decision was unreasonable." AR 1061–72 (Protest of RISC (Mar. 30, 2005)). The Air Force immediately suspended performance on the contract with HSS in accordance with FAR 33.104(c)(1). AR 1049 (Letter from Chesher to Keith Ramsey, HSS

(Mar. 31, 2005)). Thereafter, the Air Force entered into a one-month purchase order with RISC, as a stopgap measure, to maintain solid waste management services, because HSS's contract, before it was suspended, had been scheduled to begin on April 1, 2005. Hr'g Tr. 51:8–15 (Apr. 29, 2005). The second contract for environmental management, held by Tetra Tech, lapsed and no contractor fulfilled that contract's responsibilities. *Id.* 82:24 to 84:9 (noting that no company was performing the gas sampling and reporting at that time).

GAO ultimately rejected RISC's protest because it did "not establish a basis for challenging the agency's action." AR 1129 (*Matter of RISC Management Joint Venture,* B–296175 (GAO Apr. 18, 2005)). As a result, the Air Force lifted the stay of performance on the contract with HSS and declared that performance on the contract would begin on May 1, 2005. AR 1132 (Letter from Chesher to Ramsey (Apr. 20, 2005)). HSS assumed performance of the contract on that date and has been performing under the contract since that time. *See* Defendant's Motion for Judgment Upon the Administrative Record ("Def.'s Mot.") at 10.

RISC filed its complaint in this court on April 22, 2005 and submitted an application for a temporary restraining order on April 28, 2005. At a hearing on April 29, 2005, the court denied RISC's application for a temporary restraining order without prejudice. The court determined that the Contracting Officer's procurement decision was largely based on her perceived distinctions in the subcontractors that each offeror put forward to provide environmental services. Hr'g Tr. 132:14 to 133:11 (Apr. 29, 2005). The court denied RISC's application on the ground that the court did not have, at that time, sufficient information about the materials presented to the Contracting Officer with respect to those subcontractors. *Id.* 133:11 to 134:9.

The court thereafter scheduled a hearing on cross-motions on the administrative record for July 22, 2005.[12] However, RISC moved for suspension of the schedule to pur-

---

12. 28 U.S.C. § 1491(b)(3) provides that "[i]n exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action."

sue supplementation of the record and limited discovery. The court accordingly canceled the scheduled hearing. Order of May 31, 2005. Thereafter, the court granted a motion for discovery in part, permitting RISC to conduct limited discovery in two areas: (1) the Contracting Officer's consideration of Inland Service's past performance in the preparation of environmental reports at Fort Hood, Texas, and (2) conversations that the Contracting Officer had with the third parties RISC had named as references for Pellu. Order of June 29, 2005, at 1. The court allowed that restricted inquiry because RISC "ha[d] made a sufficient showing that the Air Force's contracting authority may have gained knowledge [in those areas] that is not reflected in the administrative record as it now stands." *Id.* at 2. Pursuant to the court's order, a deposition of the Contracting Officer, Donna Chesher, was conducted on August 25, 2005.

When the parties did not thereafter submit a proposed schedule for further proceedings, the court requested they do so by way of a Joint Status Report. *See* Order of Oct. 7, 2005. A schedule for briefing of cross-motions was then established, *see* Order of Nov. 9, 2005, and, because equitable relief was contested, an argument of the cross-motions for judgment on the administrative record and a trial on equitable issues were conducted on January 19, 2006. The case is now ready for disposition.

## ANALYSIS

This court has jurisdiction over this post-award bid protest to consider RISC's claim that the Air Force Contracting Officer's decision to award the contract to HSS was improper. 28 U.S.C. § 1491(b)(1). RISC has established that it is an "interested party" in the procurement, *id.*, and that it has standing to pursue this protest. *See Asia Pac. Airlines v. United States,* 68 Fed.Cl. 8, 17–18 (2005) (citing *Banknote Corp. of Am. v. United States,* 365 F.3d 1345, 1351–52 (Fed.Cir. 2004)).

RISC asserts two grounds on which the Contracting Officer's decision should be over-

turned. The first ground concerns the Contracting Officer's evaluation of past performance. RISC principally contends that the Contracting Officer did not properly or reasonably evaluate RISC's past performance, specifically for environmental services. Plaintiff's Cross Motion for Judgment Upon the Administrative Record ("Pl.'s Mot.") at 14–18.[13] RISC asserts that the Contracting Officer's assessment of its past performance did not incorporate joint venture-owner Inland Service's environmental management at Fort Hood, Texas. *Id.* at 15–16. Further, RISC argues that its own environmental monitoring and reporting activities under the incumbent contract at Vandenberg through subcontractor Pellu were not taken into account. *Id.* at 16. In that connection, RISC objects to the Contracting Officer's beliefs that Pellu would perform all the environmental services under the Solicitation and that none of Pellu's past performance was relevant. *Id.* at 16–17. The government and intervenor HSS counter that RISC had a duty to provide sufficient information to establish that Pellu had recent and relevant past experience in environmental management. Def.'s Mot. at 16–18; Defendant–Intervenor Health Sanitation Service's Motion for Judgment on the Administrative Record ("Int.'s Mot.") at 10–14. The government and HSS aver that the submissions RISC provided with respect to Pellu's past performance were inadequate because they did not include essential information and were not in the form required by the Solicitation. Def.'s Mot. at 17–18; Int.'s Mot. at 12–13; *see* AR 42 (Addendum 5.b to FAR 52.212–1).

Secondly, RISC submits that the Air Force made an unreasonable best-value decision in the ultimate selection of HSS for the contract. Pl.'s Mot. at 18–21. RISC argues that even if the Air Force's assessment of RISC's past performance was reasonable, its application of the performance-price trade-off technique was improper. *Id.* at 19. As RISC would have it, the difference in RISC's past performance confidence rating of "Very Good" and HSS's classification of "Exceptional" did not justify the price disparity of ap-

---

**13.** RISC does not challenge the decision of the Contracting Officer to award HSS a past per-

formance confidence rating of Exceptional. Hr'g Tr. 18:19–24.

proximately $1.5 million between the two. *Id.* RISC also contends that the Contracting Officer's best-value decision was flawed because she focused so strongly on a single aspect of the contract, *i.e.,* environmental management and reporting services. *Id.* at 19–20. The government and HSS defend the Air Force's best-value decision and emphasize the importance of strong environmental management and the adverse consequences that Vandenberg would face should violations of regulatory requirements occur. Def.'s Mot. at 18–19; Int.'s Mot. at 16–17.

### A. Standards for Decision

The standards prescribed in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, govern review of a federal agency's decision regarding a contractual solicitation or award. *See* 28 U.S.C. § 1491(b)(4). Pursuant to Section 706, a reviewing court shall set aside an agency action when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see PGBA, LLC v. United States,* 389 F.3d 1219, 1225–26 (Fed.Cir. 2004) (holding that 28 U.S.C. § 1491(b)(4) incorporates only the standard of review from 5 U.S.C. § 706 and does not eliminate the court's discretion as to the appropriateness of injunctive relief). If plaintiff shows by a preponderance of the evidence that "the procurement official's decision lacked a rational basis ... [or] the procurement procedure involved a violation of regulation or procedure," then this court should overturn the agency's action. *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332 (Fed.Cir.2001) (citing *Kentron Hawaii, Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973)); *see also Gentex Corp. v. United States,* 58 Fed.Cl. 634, 648 (2003). In evaluating the parties' contentions, "the court 'is not empowered to substitute its judgment for that of the agency'" but instead "must look to the see whether the agency considered the relevant factors and made a rational determination." *Keeton Corrs., Inc. v. United States,* 59 Fed.Cl. 753, 755 (2004) (quoting *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), and citing *Advanced Data Concepts, Inc. v. United*

*States,* 216 F.3d 1054, 1057–58 (Fed.Cir. 2000)).

The court, when determining whether the government lacked a rational basis in making a procurement decision, must decide if " 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion,' " with the burden of proof resting on the plaintiff. *Impresa Construzioni,* 238 F.3d at 1333–34 (quoting *Saratoga Dev. Corp. v. United States,* 21 F.3d 445, 456 (D.C.Cir.1994)). A contracting officer's decision can lack a rational basis where it " 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.' " *Keeton Corrs.,* 59 Fed.Cl. at 755 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

### B. Consideration of Past Performance

In reviewing an agency's rating of past performance, this court should focus on whether "the evaluation was reasonable, consistent with the stated evaluation criteria[,] and compli[ant] with relevant statutory and regulatory requirements." *JWK Int'l Corp. v. United States,* 52 Fed.Cl. 650, 659 (2002). The procuring authority is not remitted to her own resources in developing information about past performance. The offeror bears the affirmative obligations of ensuring that its response to a Solicitation is complete and of clarifying any concerns that might arise from the Contracting Officer or other procuring authority. *See International Outsourcing Servs., LLC v. United States,* 69 Fed.Cl. 40, 47–50 (2005). In *International Outsourcing,* the court found that the protesting party's "proposal was eliminated from [consideration] because, despite two rounds of discussions, it failed to provide sufficient information to alleviate the contracting officer's concerns regarding the risks posed by its proposal." *Id.* at 47; *see also Matter of AIROD Sdn. Bhd.,* B–294127, 2004 CPD ¶ 156, 2004 WL 1837885, at *5 n. 1 (GAO Aug. 16, 2004) (noting that the protest-

er "bore the responsibility for providing sufficient detail about its past performance for the Air Force to recognize that the work involved was very relevant rather than semi-relevant"); *Matter of Ervin & Assocs., Inc.*, B–280993, 98–2 CPD ¶ 151, 1998 WL 886550, at *3 (GAO Dec. 17, 1998) ("[A]n offeror must demonstrate affirmatively the merits of its proposal, and it runs the risk of rejection if it fails to do so.").

▉ Past performance information regarding RISC's proposed subcontractor, Pellu, was lacking or deficient. No recent or relevant contracts for Pellu were generated from PPIRS or CCASS, AR 570–71 (Summary Chart of Reports), nor did RISC provide the Contracting Officer with any references for Pellu in its initial submission. *See* AR 660 (Letter from Place to Chesher).[14] To fill this void, the Contracting Officer, Ms. Chesher, verbally requested that RISC provide additional past performance information for Pellu. On March 1, 2005, RISC responded by submitting a one-page summary stating that RISC used Pellu as a subcontractor at Vandenberg for four years "to design and install the current groundwater reclamation system and condition[ing] system" and to "conduct[ ] all tests and provide[ ] appropriate reports to RISC." AR 661 (RISC Reference for Pellu). RISC then described in detailed terms the unique treatment process that Pellu developed and used at Vandenberg. *Id.*[15] Nevertheless, in the summary of RISC's contract at Vandenberg, included in volume one of RISC's proposal, RISC stated that one of *its* responsibilities was the operation and management of a groundwater treatment system, failing to mention Pellu or describe any role that Pellu may have had in environmental services under that contract. AR 281 (Summary of RISC's Vandenberg Contract).[16] By contrast, HSS described SRS's responsibilities when it had performed similar services at Vandenberg. *Compare* AR 281 (Summary of RISC's Vandenberg Contract), *with* AR 677–78 (Summary of SRS's Vandenberg Contract) (noting that SRS provided such services as "water sampling, permit preparation, review and updates, management plan development, review and coordination, and both formal and informal audits to assure compliance").

RISC provided five additional references for Pellu. AR 660 (Letter from Place to Chesher), 664–66 (References for Pellu). The Contracting Officer contacted each of the five references. Dep. Tr. 17:22–24 (Deposition of Donna Chesher (Aug. 25, 2005)). The first reference, Tetra Tech, did not return a Contractor Performance Assessment Questionnaire but a representative verbally informed the Contracting Officer that Tetra Tech's experience with Pellu was over five years old; thus, the reference was not considered as part of Pellu's past performance assessment as it fell outside the Solicitation's definition of recency. Dep. Tr. 19:8 to 20:6 (Deposition of Chesher); *see* AR 42 (Addendum 5.a to FAR 52.212–1). The second reference was McClellan Air Force Base, a representative of which responded to the Contracting Officer's telephonic inquiry by

14. Unlike RISC, HSS provided a past performance reference in its proposal that assigned its subcontractor for environmental management, SRS, an overall rating of Very Good/Significant Confidence for its services and a rating of Exceptional for its ability to "meet all applicable environmental requirements." AR 902–904 (Contractor Performance Assessment Questionnaire (Jan. 31, 2004)).

15. In addition, RISC included information about some of Pellu's engineers, AR 662–63, but it also supplied a confusing description of Pellu's prior work at Vandenberg by noting that although Pellu designed and maintained the groundwater treatment system at Vandenberg, Tetra Tech, not RISC, had been the prime contractor for that project. AR 662; *see* AR 664 (providing Tetra Tech, not RISC, as a reference for Pellu's work on the groundwater reclamation unit at Vandenberg).

Of lesser importance, RISC's submission did not comport with the Solicitation's requirements that a reference had to submit its past performance evaluation of an offeror, or a subcontractor, via a Contractor Performance Assessment Questionnaire. *See* AR 158–59 (Amended Addenda 5.g, h to FAR 52.212–1).

16. In its response to the Solicitation, RISC had specifically identified Pellu as its proposed subcontractor for leachate treatment and groundwater monitoring, AR 413 (Subcontracted Services), and thus could not avoid providing past performance evaluations for Pellu by substituting references that related to the performance of environmental functions in prior contracts by Inland Service or itself.

stating that Pellu only sold and applied chemicals to treat contaminated water and provided demonstrations. Dep. Tr. 21:11–20 (Deposition of Chesher); AR 653–55 (Contractor Performance Assessment Questionnaire (Mar. 9, 2005)). The representative of McClellan also responded that the treated water was sent off-site for testing to be performed by a company other than Pellu. Dep. Tr. 22:1–6 (Deposition of Chesher); AR 653. A representative of the third reference, the Casmalia Superfund Site, verbally informed the Contracting Officer that although Pellu performed a demonstration, it was not retained to provide services. Dep. Tr. 23:13 to 24:9 (Deposition of Chesher); see AR 667 (Contracting Officer's handwritten notes). Another reference, DK Environmental Services, informed the Contracting Officer that it had been purchasing Pellu's chemical products for a year and that it consulted with Pellu on technical services. Dep. Tr. 25:17–23 (Deposition of Chesher); AR 647–49 (Contractor Performance Assessment Questionnaire (Mar. 9, 2005)). The final reference was U.S. Filter Recovery Services, which advised that it had completed side-by-side testing with Pellu but had not entered into any contract with Pellu. AR 650–52 (Contractor Performance Assessment Questionnaire (Mar. 9, 2005)). With this information, the Contracting Officer determined that none of the work which Pellu performed for any of the five references was relevant. AR 953 (Proposal Evaluation Report § 2.1(b)(1)(b)).

Based upon this record, the court concludes that RISC failed to provide adequate past performance information for Pellu. See International Outsourcing, 69 Fed.Cl. at 47. The Contracting Officer could only evaluate Pellu's past performance according to the information that was presented to her: RISC's one-page summary and her telephone calls to five additional references. See AR 660–66 (RISC's supplemental submission). RISC did not adequately describe its work with Pellu on the Vandenberg contract, see AR 158–59 (Amended Addenda 5.g, h to FAR 52.212–1), 953 (Proposal Evaluation Report § 2.1(b)(1)(b)), and the five references provided for Pellu were not relevant to the environmental services to be performed at the Vandenberg landfill but rather addressed product sales, demonstrations, consulting services, and testing that fell outside the recency and relevancy parameters of the Solicitation. Compare AR 647–55, 664–67 (describing the references' past performance evaluations of Pellu), with AR 42 (Addendum 5.a to FAR 52.212–1) (defining recent and relevant past performance). As RISC avers, Pellu might well be "technically qualified" to perform the environmental management tasks that RISC would have assigned it, Pl.'s Reply at 4, but Pellu's "identifiable" past performance record was not established with clarity and assurance on this record. See AFFARS 5315.305(a)(2)(E); AR 43 (Addendum 5.e to FAR 52.212–1). The Contracting Officer therefore was neither arbitrary or capricious in awarding Pellu a past performance rating of Neutral, and the court rests its decision in that regard on the failure of RISC to address the concerns of the Contracting Officer respecting Pellu.

### C. Best–Value Determination

■ RISC also contests the Contracting Officer's best-value determination. Pl.'s Mot. at 19–21. RISC has a significant burden of showing error in that regard because a court must accord considerable deference to an agency's best-value decision in trading off price with other factors. See Information Tech. & Applications Corp. v. United States, 51 Fed.Cl. 340, 343, 346 (2001) (reviewing a best-value decision where the contract was to be awarded to the offeror that gave the government the "greatest confidence" that the offeror "would best meet the contract requirements affordably") (citing CACI Field Servs., Inc. v. United States, 13 Cl.Ct. 718, 725 (1987), aff'd, 854 F.2d 464 (Fed.Cir. 1988)), aff'd, 316 F.3d 1312 (Fed.Cir.2003); see also E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed.Cir.1996); Bean Stuyvesant, L.L.C. v. United States, 48 Fed.Cl. 303, 320 (2000); Cubic Def. Sys., Inc. v. United States, 45 Fed.Cl. 450, 458 (1999).

■ The record shows that the Contracting Officer had only a general understanding of the differences between the incumbent contract under which RISC performed from 1999 through April 2005 and the new con-

tract that was being awarded in the Solicitation. The Solicitation brought together work under the two prior contracts with respect to the Class III landfill at Vandenberg, which were being performed by RISC and Tetra Tech, respectively. *See supra*, at 626. It appears that Tetra Tech's services focused on aspects of air monitoring and reporting functions. *See* Hr'g Tr. 22:25 to 23:3; AR 82, 83–85 (Solicitation, Appendix # 5, "Environmental Compliance," ¶¶ 7.1 ("Air Quality"), 8.0 ("Air Quality Requirements")). This aspect of the Solicitation is vague, however, and the record is devoid of any delineation of what specific environmental responsibilities had been performed under the Tetra Tech contract and consequently were combined with the functions performed under RISC's prior contract to form the Solicitation.[17] In this same vein, the Contracting Officer's explanation for combining both the RISC and Tetra Tech contracts into a single solicitation similarly is amorphous and lacks detail. AR 957 (Proposal Evaluation Report § 4.1(b)(1)) (noting merely that the new arrangement would simplify the operation of the landfill and increase efficiency).[18]

Moreover, in the Proposal Evaluation Report, which served as a written explanation for the ultimate procurement decision, the Contracting Officer contradicted herself and thus displayed her own lack of understanding of which responsibilities formerly performed by Tetra Tech had been added to the Solicitation. In the report, she stated that all of the environmental functions of the landfill at Vandenberg were originally performed under a separate contract. AR 957 (Proposal Evaluation Report § 4.1(b)(1)) ("Until now, the environmental sampling, monitoring, reporting and compliance efforts were handled under a separate contract."). However, an attachment to the report set out a "grid [designed] to assist in evaluating past performance relevancy," AR 959 (Proposal Evaluation Report) (capitalization omitted), and the portion of the grid relating to the contract for operation of the landfill at Vandenberg under which RISC previously performed indicated that one of RISC's responsibilities was "environmental management." *Id.* at 962 (Proposal Evaluation Report: Attachment # 1).[19]

In short, the record reflects the Contracting Officer's lack of knowledge and understanding with respect to the differences between the two prior solid waste management contracts at Vandenberg and the degree to which consolidation of those contracts as contemplated by the Solicitation expanded the environmental services required. This lack of understanding ripened into an overemphasis on environmental functions relative to the overall work to be performed. Ms. Chesher described the environmental monitoring of the landfill as requiring "above-standard contractor performance" because the landfill was the second most environmentally regulated facility at the base and subject to review by numerous federal, state and local government agencies. AR 957 (Proposal Evaluation Report § 4.1(b)(1)). She continued by noting that any failure in environmental compliance would cause an "immediate and significant" impact on the base's ultimate mission. *Id.* (Proposal Evaluation Report § 4.1(b)(2)). Moreover, she calculated the potential financial cost to the base, should the contractor entrusted with the landfill's operation fail an environmental inspection, by listing the maximum penalties that could be levied along with the expense of sending the base's solid waste to another facility. AR 957–58 (Proposal Evaluation Report § 4.1(b)(2)). There is no doubt that the Contracting Officer

---

17. Counsel for the government was unable to specify what new responsibilities were added to the Solicitation compared to those performed by RISC under its prior contract. Hr'g Tr. 40:18 to 42:17, 45:13 to 48:3.

18. HSS's proposal contains a chart that lists prices for two air-emission-related functions called for by the Solicitation: preparation and submission of an annual air emissions inventory and of a quarterly landfill gas monitoring report. AR 688 (HSS Proposal, Pricing).

19. Correspondingly, in the section of RISC's proposal listing past performance, RISC summarized the environmental management responsibilities that it had performed at the landfill at Vandenberg. *See* AR 281 (Summary of RISC's Vandenberg Contract) (stating that a responsibility under the incumbent contract was to operate and maintain the groundwater reclamation and conditioning system).

properly identified the maximum risk involved, but she did not assess the likelihood that such draconian consequences would be realized. There is no evidence in the administrative record that any environmental problems had arisen while RISC and Tetra Tech were performing environmental functions under the prior contracts. *See* Hr'g Tr. 25:3 to 27:2; AR 455–57 (Contractor Performance Assessment Report (Apr. 15, 2004)), 458–60 (Contractor Performance Assessment Report (Dec. 11, 2002)).

Nonetheless, despite these flaws, the Contracting Officer had independent reasons to assign confidence ratings that indicated the government held "essentially no doubt," for HSS or "little doubt," with respect to RISC, that either company could perform the requirements under the contract, including all environmental monitoring, sampling, and reporting obligations. AR 958 (Proposal Evaluation Report § 4.1(c)). RISC, through its joint venture-owner Red River, received four past-performance ratings of Marginal for refuse collection on a contract at Fort Lewis, Washington, largely due to multiple equipment failures, scheduling delays, and lack of personnel. AR 521–22 (Contractor Performance Assessment Report (May 29, 2002)). The Contracting Officer specifically cited these ratings as a justification for why the evaluation team's confidence in RISC's ability to perform under the contract was lowered. AR 954 (Proposal Evaluation Report § 2.1(b)(1)(c)(2)). Furthermore, RISC, through joint venture-owner Inland Service, received overall ratings of Satisfactory from two of its references for past contracts related to solid waste management, compared to HSS, which received overall ratings of Very Good or higher from all of its references. *See* AR 603–05 (Contractor Performance Assessment Questionnaire (Mar. 2, 2005)) (noting the issuance of letters of concern due to driver issues and timeliness), 615–18 (Contractor Performance Assessment Questionnaire (Jan. 19, 2005)). *Compare* AR 948 (Proposal Evaluation Report § 2.1(a)(1)) (chart of references' past performance rat-

ings for HSS), *with* AR 951–52 (Proposal Evaluation Report § 2.1(b)(1)) (chart of references' past performance ratings for RISC). In sum, HSS's relatively higher past-performance ratings are supported by the record.[20] Those higher ratings in turn support the Contracting Officer's performance-price trade-off and her decision to award the Vandenberg contract to HSS.

"This court is acutely aware that it may not [substitute] its judgment for that of the agency." *OTI America, Inc. v. United States,* 68 Fed.Cl. 646, 657 (2005) (citing *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,* 435 U.S. 519, 557–58, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *Keeton Corrs.,* 59 Fed.Cl. at 755). In the present case, although the court would have undertaken a different analytical approach had it been in the shoes of the Contracting Officer, it cannot conclude that the Contracting Officer made an unsupported best-value determination or that her decision to award the contract to HSS was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## CONCLUSION

For the reasons set forth above, the government's and HSS's motions for judgment on the administrative record are GRANTED. Plaintiff RISC's cross-motion for judgment on the administrative record correspondingly is DENIED. The Clerk is directed to enter final judgment for defendant. No costs.

Because this decision might have contained "confidential or proprietary information" within the meaning of RCFC Appendix C, ¶ 4, it was initially issued under seal. The parties were requested to review the decision and to file proposed redactions on or before February 23, 2006. No such redactions were proposed.

IT IS SO ORDERED.

---

20. HSS concededly had fewer past performance ratings than RISC. RISC had ten relevant contracts that were the subject of PPIRS and CCASS evaluations and twelve relevant references, com-

pared to HSS which had no relevant government contracts from the automated information systems and only eight relevant references. *See supra,* at 631.